**UNITED STATES of America**

v.

**Leon R. CURTIS.**

**Crim. No. 1052–70.**

United States District Court, District of Columbia.

April 25, 1972.

## OPINION

HART, District Judge.

By opinion, dated January 18, 1972, 459 F.2d 1362, the United States Court of Appeals for the District of Columbia Circuit remanded this case to determine whether a respected member of the Bar, an officer of this Court, had lied to a defendant, and inferentially lied to the Court, concerning a plea. Such a remand puts the personal and professional integrity of the attorney in question. The charges, if true, would justify disbarment.

On June 22, 1970, the defendant was indicted, charged with "armed robbery," and three other offenses. He was arraigned on July 6, 1970, and plead "Not Guilty."

On July 24, 1970, defendant's counsel moved for a mental examination for defendant and the motion was granted. On September 22, 1970, the Staff of St. Elizabeth's Hospital found that defendant suffered from drug dependence, heroin, but that he was competent to stand trial and was not suffering from a mental disease or defect.

On October 30, 1970, defendant withdrew his plea of "Not Guilty" as to Count Two, charging "robbery" and

plead "Guilty" thereto. (The following occurred at the time defendant plead.)

"THE COURT: Miss Harris, we will take your case now.

"Do you have some representation to make?

"MISS HARRIS: Yes, Your Honor, this is here today for a disposition, for a withdrawal of the plea of not guilty and a plea to robbery, count 2 of the indictment, under Section 22–2901 of the District of Columbia Criminal Code.

"THE COURT: That is robbery as differentiated from armed robbery?

"MISS HARRIS: That is correct, sir.

"THE COURT: All right.

"Now, Mr. Curtis, I advise you and I want you to understand that you have Constitutional rights as follows: You have a right to a speedy trial by jury with the aid of counsel; you have a right against compulsory self-incrimination; and you have a right to face your accusers. If you plead guilty to the second count charging you with robbery, you will waive all three of those rights as they apply to that count and the matters involved therein. Do you understand that?

"DEFT. CURTIS: Yes, sir.

"THE COURT: You will have the assistance of counsel at the time of sentence if your plea is accepted; do you understand that?

"DEFT. CURTIS: Yes, sir.

"THE COURT: Now, the second count charges you with the crime of robbery, and do you understand that?

"DEFT. CURTIS: Yes, sir.

"THE COURT: The elements of the crime of robbery are these, as they apply particularly to this case: That is, that on or about April 8, 1970, within the District of Columbia, you along with William T. Weaver, took certain property away from the complaining witness, Thermon E. Statum; that is one element; do you understand that?

"DEFT. CURTIS: Yes, sir.

"THE COURT: Another element is that you took it unlawfully with intent to convert it to your own purposes; do you understand that?

"DEFT. CURTIS: Yes, sir.

"THE COURT: Another element is that you took it from the complainant's person or immediate actual possession; do you understand that?

"DEFT. CURTIS: Yes, sir.

"THE COURT: Another element is that you took it by force or violence against resistance or by putting the complainant, Mr. Statum, in fear; do you understand that?

"DEFT. CURTIS: Yes, sir.

"THE COURT: What in fact did you do on that day? What did you and Weaver do with Mr. Statum?

"DEFT. CURTIS: We were sitting in a car waiting for his girl friend and his other friend, waiting for him to bring back some narcotics, you know, so we stayed in the car so long until they started coming down, and we were getting sick, so I said Man, we got to get some money, like that. He said I know it. I said What we going to do? He say he don't know. So this man by the name of Mr. Statum drove up behind us, and he say You want to get him? I say, Might as well take a chance. So we got out the car and Mr. Statum got out first out of his car and we got out and he say Have you seen—you know, he was wobbling like he had been drinking, and he asked me, asked us rather, Have you seen a girl about so high? I said Yes, I seen her. He said Can you tell me where she went to? I said, She went in there, like that. So he walked towards the door. When he walked towards the door we came up behind him and demanded money. I took a watch from him and put him back in the car.

"THE COURT: Did one of the two of you have a gun?

"DEFT. CURTIS: Yes, sir.

"THE COURT: All right. Has your guilty plea been induced by any promise or representation by anyone as to what

sentence will be imposed by this Court? Has anybody told you what sentence I am going to give you?

"DEFT. CURTIS: Sentence?

"THE COURT: Sentence, how long I am going to send you to jail for, if I send you at all, has anybody told you?

"DEFT. CURTIS: No, sir.

"THE COURT: Let me tell you this: I don't know myself what sentence I am going to give you until after I read the pre-sentence report and know all about you and give you and your counsel a chance to speak at your sentence. Therefore, if I don't know, no one else could know. Do you understand that?

"DEFT. CURTIS: Yes, sir.

"THE COURT: Has any promise of any kind been made to induce your plea of guilty except that the remaining counts of the indictment will be dismissed at the time of sentence if your plea is accepted? Have any other promises been made to you?

"DEFT. CURTIS: No, sir.

"THE COURT: Do you understand as a result of your plea you could be sentenced to as much as fifteen years in prison?

"DEFT. CURTIS: Yes, sir.

"THE COURT: Are you entering this plea voluntarily of your own free will because you are guilty and for no other reason?

"DEFT. CURTIS: Yes, sir.

"THE COURT: Have you discussed the entry of this plea fully with your attorney?

"DEFT. CURTIS: Yes, sir.

"THE COURT: Are you completely satisfied with the services of your attorney in this case?

"DEFT. CURTIS: Yes, sir.

"THE COURT: Take his plea to the second count.

"THE DEPUTY CLERK: Leon R. Curtis, in Criminal No. 1052–70, do you wish to withdraw your plea of not guilty heretofore entered, and enter a plea of guilty to count 2 of the indictment which charges robbery?

"DEFT. CURTIS: Yes, sir.

"THE COURT: Order a pre-sentence report; commit the defendant."

On January 15, 1971, defendant was sentenced to from 3 to 15 years and the remaining Counts of the indictment, including one for "armed robbery," were dismissed. (The following is the transcript of the sentencing procedure.

"THE COURT: The defendant, Leon R. Curtis, is before this Court today for sentencing in Criminal No. 1052–70, having been convicted of robbery on a plea of guilty to count 2 of a four-count indictment charging armed robbery, robbery, assault with a dangerous weapon and unauthorized use of a vehicle.

"Counsel, do you have anything to say before the Court passes sentence?

"MISS HARRIS: May it please the Court:

"We urge the sentencing of the defendant under the Youth Corrections Act, 18 U.S.Code Section 5010. Under a recent decision of the Court of Appeals, U. S. versus Walters, it has been stated that in the absence of an affirmative finding of incorrigibility, the Court must make a commitment and sentence under that statute.

"On the basis of the pre-sentence report and on the basis of the past record of this defendant, for whom this is the first felony conviction, I would say there is too little evidence to make an affirmative finding of incorrigibility. He falls within the age limits of the Youth Corrections Act, he is under 22, age 20, and as the Court said in the Walters case, the Congressional intent was toward an expectation and hope for rehabilitation for persons of this age.

"I would urge, therefore, under 18 U.S.C. § 5010, whose provisions made it possible to extend commitment, that option in favor of rehabilitation be accepted by this Court. I would urge the Court even with the difficulties involved in such a recommendation, to recommend to the Attorney General the most extensive kind of psychiatric evaluation for this young man whose past social history is such that it seems to me he does de-

serve the best we can give in rehabilitative efforts.

"THE COURT: You, of course, have read his presentence report?

"MISS HARRIS: That is correct.

"THE COURT: Which the Court made available to you.

Mr. Curtis, have you anything to say?

"DEFT. CURTIS: Yes, sir, Your Honor. All I have to say is if I ever get out of this, I would like to better myself and learn some type of skill and stop leading the life of crime. That's all, Your Honor.

"THE COURT: Well, this Court disagrees with counsel. It's true that this defendant, because of his age, is eligible for sentencing under the Youth Corrections Act. However, a reading of the pre-sentence report, which contains the past history of this defendant, and no indication that any of the pre-sentence report is erroneous, would indicate to the Court that this defendant has no marketable skill whatever, that he would profit in no wise from the Youth Corrections Act, that he is not subject, in the opinion of the Court, to be rehabilitated under the Youth Corrections Act, and this Court is, therefore, of the opinion that a relatively low minimum sentence with a high maximum sentence would best serve the interests of justice in this case and permit this defendant to learn a trade, to obtain a reasonably early release if he will work at it, but, on the other hand, permitting the Parole Board to protect the public in the event this defendant should not prove susceptible to rehabilitation in the prison system.

"It is, therefore, the judgment of this Court that you be imprisoned in a place of confinement to be designated by the Attorney General of the United States, or his authorized representative, for a term of not less than three years, and not more than fifteen years. The foregoing sentence is to be served consecutively to any sentence imposed prior to this date by any court in this or any other jurisdiction, state or federal.

"It is the recommendation of this Court that this prisoner be sent by the Attorney General to a Federal Institution where he can be taught a trade. All right.

"MISS HARRIS: Thank you, Your Honor. For the record may the defendant simply render his objection to the consecutive sentence made, simply to protect the record, and also to renew the position that under the circumstances a commitment under the Youth Corrections Act is required?

"THE COURT: You may. I don't think it is necessary, but you may.

"MR. HOFFMAN: The Government moves to dismiss the remaining counts, Your Honor.

"THE COURT: Remaining counts will be dismissed. Thank you.

"MISS HARRIS: Thank you, Your Honor."

Under date of March 9, 1971, defendant wrote a letter to the Trial Court which was received by the Clerk on March 17, 1971. In this letter, dated almost two months after his sentence, defendant for the first time alleged to the Trial Court that he had plead relying on a "promise" by his lawyer that he would receive a sentence under the Youth Corrections Act. This statement in the letter was directly contrary to the defendant's statements to the Court at the time of the plea on October 30, 1970. (See Transcript of October 30, 1970, supra.) Further, on January 15, 1971, when defendant was sentenced to 3 to 15 years, he made no mention of any YCA promise by his attorney. If any such promise had been made, surely the defendant would have mentioned it when he heard a sentence of 3 to 15 years pronounced against him.

This defendant was not unfamiliar with courts and court procedures. See Curtis v. United States, D.C.App., 268 A.2d 603 (1970). In that case this defendant had plead to a misdemeanor in the District of Columbia Court of General Sessions. The Judge, in taking defendant's plea, advised him that he could

be sentenced to 365 days in jail. Defendant was not advised that he could be sentenced under the Youth Corrections Act. Defendant was committed for study under 18 U.S.C. § 5010(e). Later, defendant appeared before the Court and the Court indicated it was going to sentence the defendant under the Youth Corrections Act. Defendant immediately asked to withdraw his plea on the grounds that he "understood" he could be confined for 6 years if so sentenced and this had not been explained to him. Defendant was, nevertheless, sentenced under the Youth Corrections Act. He appealed and his case was reversed on the authority of Carter v. United States, 113 U.S.App.D.C. 123, 306 F.2d 283 (1962). It is not believable, under the circumstances, that if this defendant had been promised a Youth Corrections Act sentence by his attorney that he would have stood silent when a sentence of 3 to 15 years was pronounced on him.

The Court treated defendant's letter of March 9, 1971, as a "Motion to Reduce Sentence and For a New Trial" and denied same. The Court at that time wrote defendant as follows:

"Mr. Leon R. Curtis
Lorton Complex
Lorton, Virginia

"Dear Mr. Curtis:

In reply to your recent communication of March 9, 1971, which you asked to be treated as a motion for a new trial or for a reduction of sentence, I quote to you the following colloquy which occurred between you and myself at the time of your sentence:

" 'THE COURT: All right. Has your guilty plea been induced by any promise or representation by anyone as to what sentence will be imposed by this Court? Has anybody told you what sentence I am going to give you?

" 'DEFT. CURTIS: Sentence?

" 'THE COURT: Sentence, how long I am going to send you to jail for, if I send you at all, has anybody told you?

" 'DEFT. CURTIS: No, sir.

" 'THE COURT: Let me tell you this: I don't know myself what sentence I am going to give you until after I read the pre-sentence report and know all about you and give you and your counsel a chance to speak at your sentence. Therefore, if I don't know, no one else could know. Do you understand that?

" 'DEFT. CURTIS: Yes, sir.

" 'THE COURT: Has any promise of any kind been made to induce your plea of guilty except that the remaining counts of the indictment will be dismissed at the time of sentence if your plea is accepted? Have any other promises been made to you?

" 'DEFT. CURTIS: No, sir.

" 'THE COURT: Do you understand as a result of your plea you could be sentenced to as much as fifteen years in prison?

" 'DEFT. CURTIS: Yes, sir.

" 'THE COURT: Are you entering this plea voluntarily of your own free will because you are guilty and for no other reason?

" 'DEFT. CURTIS: Yes, sir.'

"In view of the foregoing, I consider your letter frivolous and your motion is denied."

On March 30, 1971, defendant filed a pro se motion under 28 U.S.C. § 2255, in which he again made unsworn allegations as to the alleged promise of his attorney that he would be sentenced under the Youth Corrections Act.

The unsworn petition in this case follows word for word the unsworn petition of the defendant in United States v. Simpson, 141 U.S.App.D.C. 8, 436 F.2d 162 (1970). The Simpson case has had three post trial hearings in the District Court, two in the Court of Appeals, and is now on its third trip to the Court of Appeals. It has cost the taxpayers thousands of dollars in an effort to determine whether the unsworn, unsupported word of a convicted felon attacking his lawyer's honesty and integrity is true.

In the Simpson case one Trial Judge found on October 12, 1970, as follows:

"* * * it is entirely apparent that Mr. Simpson is untrustworthy, a man who can be given no credibility whatsoever, and the Court disregards and rejects his entire testimony. His statement to the probation officer which he now renounces, his statements to the Court about the offense which he now renounces, the clear indication in the jacket that he was specifically involved, which he now denies, all make it quite clear that the petitioner has little regard for the truth, little understanding of his responsibilities to tell the truth, and the Court cannot accept his testimony in any way."

Thereafter, another hearing ordered by the Court of Appeals before another Trial Judge was had and, on December 1, 1971, after a hearing that Trial Judge found:

"In hearing this matter without a jury, this Court becomes a judge of the credibility of the witnesses involved. This Court notes that the demeanor and behaviour of the defendant on the witness stand was sly and evasive. The defendant did not impress the Court as a truth-telling individual but, to the contrary, as one who had no respect nor regard for the truth. The defendant has a motive for not telling the truth and he has a deep interest in the outcome of this case. The Court is of the opinion that the defendant is completely unworthy of belief and that his credibility is non-existent."

In view of all the foregoing and in view of the fact that this Court feels strongly that there is, at least, an inference, if not a rebuttable presumption, of honesty and integrity on the part of attorneys and officers of this Court, the Court, without a hearing, denied the motion in the instant case as frivolous and denied defendant's motion to appeal a matter, deemed so patently frivolous that it justified no appeal, at the expense of the taxpayers.

The U. S. Court of Appeals for the District of Columbia granted defendant's leave to appeal at taxpayers' expense, and, after considering the entire record as set forth above, remanded the case to the Trial Court for further action. In the U. S. Court of Appeals' opinion is found the following statement:

"With the case in its present position we clearly must assume that the allegations of the petition are true."

If the foregoing must be assumed, then it follows that it must be assumed on this record that an able and respected member of this Bar lied to a defendant whom she represented, inferentially lied to and misled the Trial Court, committed an offense that would justify disbarment and is without personal or professional integrity. This Court is shocked that the personal and professional integrity of a member of our Bar, an officer of this Court, can be put to question on such a record.

However, the Trial Court must bow to the dictate of the Appellate Court.

On January 21, 1972, the Trial Court appointed William J. Garber, Esquire, a member of the Bar with wide experience in criminal law and criminal trials, to represent the defendant Curtis. Mr. Garber enlisted the aid of Kenneth Markison, a senior law student at George Washington University to assist him in this case.

On January 27 and February 3, 1972, Patricia Roberts Harris was put to the indignity of filing two affidavits in this cause to protect her honor and reputation against the unsworn, unsubstantiated allegations of the defendant. They were as follows, with attachments:

"AFFIDAVIT

"District of Columbia:  ss

"Patricia Roberts Harris, being duly sworn, deposes and says:

"1.  I am Patricia Roberts Harris, a member in good standing of the bar of the District of Columbia;

"2. I was appointed to represent Leon Ronald Curtis by order of this Court dated May 12, 1970;

"3. In all conferences with Mr. Curtis at the D. C. Jail, St. Elizabeth's Hospital, and at the U. S. District Court, I informed Mr. Curtis of his rights under the law, including his right to a full and fair trial, and I was at all times willing and prepared to represent Mr. Curtis at a trial in this matter, and so informed Mr. Curtis;

"4. I visited Mr. Curtis at the District of Columbia Jail on September 30, 1970, and on that occasion, after a full discussion of his case, Mr. Curtis informed me that he wished to plead guilty to the charge of robbery under D.C.Code § 22–2901;

"5. I asked Mr. Curtis if he were certain that he wished to plead guilty to violation of D.C.Code § 22–2901, and informed him again that I was prepared to represent him at a trial in this matter;

"6. I informed Mr. Curtis that I would make every effort to persuade the court to sentence him under the Youth Corrections Act, but repeatedly informed him that only the court could determine the sentence;

"7. I showed Mr. Curtis an affidavit that I had prepared for his signature, and asked him if he could read and understand the affidavit;

"8. Mr. Curtis read the affidavit and stated that he understood its contents, and that the contents stated the facts of his decision to authorize me to inform the court that he wished to enter a plea of guilty;

"9. Mr. Curtis signed the affidavit (a copy of which is attached hereto and incorporated herein by reference) in the presence of a notary public acknowledging that he had read and understood the contents;

"10. On January 15, 1971, immediately prior to the sentencing hearing, I visited Mr. Curtis in the cell block at the United States District Court and asked whether it was still his wish to enter a plea of guilty;

"11. At that time I told Mr. Curtis that the Judge had showed me the presentence report and I asked if it were accurate in certain details and he acknowledged the accuracy of the report as I described it, except with respect to one assertion of sexual aggressiveness;

"12. I informed Mr. Curtis that I had serious doubts that the Judge would sentence him under the Youth Corrections Act in view of the presentence report;

"13. I informed Mr. Curtis that he could change his mind at any time before the plea, and that he was not required to plead guilty;

"14. Mr. Curtis informed me that he still wished to plead guilty;

"15. I told Mr. Curtis that the Judge would address questions to him, but gave no instructions to him about how to respond;

"16. When the court accorded defendant's right of allocution, I asked the court to impose a sentence under the Youth Corrections Act, but the court refused to do so;

"17. I did not, at any time, have the conversation with Mr. Curtis alleged in his motion under 28 U.S.C. § 2255 as reported in 459 F.2d on page 1363 of the opinion of the United States Court of Appeals for the District of Columbia in No. 72–1050, and I learned that Mr. Curtis had alleged such a conversation for the first time upon receipt of a copy of the opinion attached to a letter from Judge George A. Hart, Jr. dated January 21, 1972;

"18. At no time did I tell Mr. Curtis to 'give appropriate answers, yes and no, when the Judge asked him certain questions, and everything would be taken care of';

"19. I did not promise Mr. Curtis that he would receive a sentence under the Youth Corrections Act and I know as a matter of law that no such promise can be effectuated by counsel;

"20. I would consider any promise of any sentence to any defendant to be a vio-

lation of my responsibility as a lawyer, and did not and would not make such a promise at any time.

"/s/ Patricia Roberts Harris
Patricia Roberts Harris

"Subscribed and sworn to before me this 26th day of January, 1972.

"/s/ Yvonne K. Bluhm
Notary Public

"My Commission Expires: July 31, 1974.

"(SEAL)"

"FILED
Jan 27 1972
James F. Davey, Clerk"

## ATTACHMENT

## "AFFIDAVIT

"DISTRICT OF COLUMBIA: SS

"Leon Ronald Curtis, being duly sworn, deposes and says:

"1. I am Leon Ronald Curtis, defendant in United States v. Leon R. Curtis, Criminal No. 1052–70.

"2. I have seen the charges against me returned under an indictment in Grand Jury No. 1154–70 — 1189–70, and I understand the nature of the charges.

"3. I have been advised by my court-appointed counsel, Patricia Roberts Harris, of my right to a trial on the charge in the above captioned matter.

"4. I have voluntarily and of my own free will authorized my court-appointed counsel, Patricia Roberts Harris and Steven Newburg-Rinn, to inform the United States Attorney and the court that I am willing to plead guilty to the charge of robbery in violation of D.C. Code § 22–2901 in the above-captioned matter, with the understanding that all other charges against me under the indictment returned in Grand Jury Number 1154– 1189–70 will be dropped.

"5. Counsel has advised me that I may receive the maximum penalty of 15 years imprisonment upon a plea of guilty under D.C.Code § 22–2901.

"/s/ Leon R. Curtis
Leon Ronald Curtis

"Subscribed and sworn to before me this 30 day of Sept., 1970.

"/s/ Wilma E. Wills
Notary Public

"My Commission Expires Nov. 14, 1974.

"FILED
Jan. 27, 1972
James F. Davey, Clerk"

## "SUPPLEMENTARY AFFIDAVIT

"District of Columbia, ss

"Patricia Roberts Harris, being duly sworn, deposes and says:

"1. I am Patricia Roberts Harris, a member in good standing of the bar of the District of Columbia;

"2. On January 26, 1972, I filed an affidavit in the above captioned matter and such affidavit is hereby reaffirmed;

"3. The affidavit of January 26, 1972, reported conversations with Leon Ronald Curtis about the sentence that could be imposed after a plea of guilty to violation of D.C.Code § 22–2901;

"4. Mr. Curtis entered a plea of guilty to violation of D.C.Code § 22–2901 October 30, 1970;

"5. On October 30, 1970, prior to the entry of the plea of guilty, my discussion with Mr. Curtis about sentencing was limited to informing him that no sentence would be imposed on that day, but that sentence would be determined after receipt by the Judge of a pre-sentence report;

"6. On that date, prior to the entry of the plea of guilty, I asked Mr. Curtis if it were still his wish to enter a plea of guilty to violation of D.C.Code § 22–2901, and I informed him he could change his mind at any time before entering the plea;

"7. Mr. Curtis stated to me again that he wished to enter a plea of guilty to violation of D.C.Code § 22–2901;

"8. I received a letter from Mr. Curtis dated November 1, 1970 stating that he wanted me to 'recommend to the Judge to give me either a ten . . . or 12 year Youth Corrections Act', and a copy

of said letter is attached hereto and incorporated herein by reference;

"9. I received another letter from Mr. Curtis dated January 5, 1971 stating that he had 'something important to discuss over with you about my case', and a copy of said letter is attached hereto and incorporated herein by reference;

"10. I held the conference with Mr. Curtis on January 15, 1971, noted in the affidavit of January 26, 1972, to discuss the pre-sentence report with him, and to confirm the fact, in view of the attached letters, that he had entered and maintained his plea of guilty freely and understandingly;

"11. I told Mr. Curtis at the conference on January 15, 1971 that if he wished to change his mind about his plea before sentencing, I would so inform the court;

"12. Mr. Curtis stated affirmatively to me that he wished to maintain his plea of guilty and that he understood that he could receive a maximum sentence of fifteen years;

"13. As stated in the affidavit of January 26, 1972, in addition to a discussion with Mr. Curtis of his rights prior to the entering of the plea, I gave Mr. Curtis a further opportunity to withdraw his plea of guilty if he wished to do so, prior to the sentencing hearing;

"14. I did not, at any time, have the conversation with Mr. Curtis alleged in his motion under 28 U.S.C. § 2255 as reported in 459 F.2d on page 1363 of the opinion of the United States Court of Appeals for the District of Columbia in No. 72–1050;

"15. At no time did I tell Mr. Curtis to 'give appropriate answers, yes and no, when the Judge asked him certain questions, and everything would be taken care of';

"16. I did not, at any time, tell or promise Mr. Curtis that he would receive a sentence under the Youth Corrections Act;

"17. It is my belief that Mr. Curtis at all times understood that no promises of a sentence of any kind were made to him

by me, and I further believe that I fulfilled the duty of counsel to make certain that the plea of guilty by Mr. Curtis was freely and understandingly entered and maintained.

"/s/ Patricia Roberts Harris
Patricia Roberts Harris

"Subscribed and sworn to before me this 2 day of February, 1972

"/s/ Yvonne K. Bluhm
Notary Public

"My commission Expires: July 31, 1974

"(SEAL)

"FILED
Feb. 3, 1972
James F. Davey, Clerk"

ATTACHMENT – 1

"Leon R. Curtis
Nov. 1, 1970
CB 1

"Dear Miss Harris,

I'm just writing you this short letter because I would like for you to recommend to the Judge to give me either a ten 10 or 12 year youth corrections Act. I know it sounds kind of silly, but this is what I would like for you to do for me please. Thank you.

"Yours truly,
/s/ L. Curtis

"P. S. Let me know something as soon as possible.

"Thank you

"FILED
Feb. 3, 1972
James E. Davey, Clerk"

ATTACHMENT – 2

"Jan. 5, 1971    Cell–323 CB–1 159–812
Leon Curtis

"Dear Miss Harris,

I'm writing to find out why it's taking me so long to appear in court for my time. It's going on two 2 months now and I haven't heard anything. I would like to know when I'm supposed to appear in court thank you. If you can I would like for you to come over because I have

something important to discuss over with you about my case.

"Signed, Leon R. Curtis
"FILED
Feb. 3, 1972
James F. Davey, Clerk"

On February 11, 1972 and March 1, 1972, Mr. Garber, in the company of Mr. Markison, interviewed the defendant at the District of Columbia Jail. On both occasions Mr. Markison took copious notes for the protection of all concerned.

Mr. Garber in the two interviews fully advised defendant Curtis of his rights in this matter as is fully set forth in Mr. Garber's report filed herein on March 25, 1972.

Mr. Garber, referring in his report to his second interview with defendant, said:

"The interview was terminated with the expectation that defendant would submit to counsel further facts concerning the allegations of his petition. To date, counsel has received no further communication from the defendant.

"Counsel is satisfied that defendant fully understands his rights and what would be expected to establish a factual basis for his claims."

Mr. Garber said in his report that he felt it desirable to give defendant a chance to appear in court to put on record whether or not he had anything further to submit.

On April 21, 1972, the matter was set for hearing in open court and the following occurred:

"PROCEEDINGS

"THE DEPUTY CLERK: United States versus Leon R. Curtis, Criminal No. 1052–70.

[Defendant present]

"THE COURT: All right, gentlemen.

Is the Government ready in this case of Leon R. Curtis?

"MR. HOFFMAN: Yes, we are, Your Honor.

"THE COURT: Mr. Garber, are you ready for the defense?

"MR. GARBER: Yes. If Your Honor please, I would like to state some facts preliminarily.

"THE COURT: Well, let me state some facts preliminarily to put us in focus of where we stand and why we are here.

We have here a case of a defendant who plead guilty to the crime of robbery. Thereafter, he made allegations of personal and professional dishonesty against a highly respected member of our bar, which allegations, if true, would justify the disbarment from future practice of this highly respected member of our bar, a former dean of a law school, a lawyer prominently mentioned for appointment to the Supreme Court.

Now, these allegations made by this defendant were not sworn, and they were in no wise substantiated in any way, shape or form. When the matter came before this Court, in view of the whole record in the case, the questions the Court had asked the defendant at the time of plea, what occurred at the time of sentence, this Court felt that the whole matter was entirely frivolous, and denied any relief.

It went to the Court of Appeals and the Court of Appeals said that in that state of the record they must assume that what this defendant said was true. It would then necessarily follow that we must assume that what this respected attorney said was untrue, and in that state of the record this Court has now set this matter down for hearing so that this defendant, under oath, can attempt to substantiate these charges that he has made, and that thereafter the law can take its course for whatever is indicated thereon.

Now, Mr. Garber, you may say what you please.

"MR. GARBER: If Your Honor please, the Court appointed me to represent Mr. Curtis in this matter, and I have had an opportunity to discuss with

him the various aspects and implications of his allegations.

I was assisted by Mr. Kenneth Markison, sitting in court, a senior law student at George Washington University, who was present with me during these conferences.

I have shown Mr. Curtis all of the affidavits and exhibits which have been filed in connection with this matter, and, of course, he has a copy of the order of the Court of Appeals.

There has been nothing submitted to date by Mr. Curtis under oath. I have advised him, and I think this should be perfectly clear on the record, that in the event that he should testify, that he would be subject to cross examination and that his testimony would constitute, in my judgment, a waiver of the attorney-client privilege, whatever attorney-client privilege he had with his former counsel, Mrs. Harris.

"THE COURT: It would most certainly constitute that, and also, depending on the circumstances, lay him open to perjury charges.

"MR. GARBER: Yes. I submit, Your Honor, before Mr. Curtis takes this step, that the Court should be satisfied that he fully understands these implications, and that he will make his own decision on these matters based upon the Court being satisfied that he does understand what his rights are in this situation.

Also, I think the record should clearly demonstrate from him that he understands the implications of taking the stand in this case.

"THE COURT: Does he wish to take the stand?

"MR. GARBER: Your Honor, I would like him to answer that before the Court and on the record.

"THE COURT: Well, come forward here, Mr. Curtis.

Mr. Curtis, if you take the stand, before you take the stand you will be put under oath. You will then be allowed to give your story, and you will, of course, have waived any attorney-client privi-

lege that you may have, and you will then be subject to cross examination by the Government.

"DEFT. CURTIS: Yes, sir, I understand.

"THE COURT: Just a minute.

Should it later turn out that your testimony on the stand was untrue, I personally will request the United States Attorney's office to bring perjury action against you.

With that in mind, do you wish to take the stand?

"DEFT. CURTIS: Judge Hart, I'd like—see, if I do take the stand, I know what the D. C., District Attorney probably will do, throw big words at me and words I don't understand, you know.

"THE COURT: Well, we will see that you understand the questions.

"DEFT. CURTIS: Can I talk to my lawyer again before—

"THE COURT: You may talk to your lawyer again.

"MR. GARBER: I think that would be wise, Your Honor.

"THE COURT: All right.

[Brief pause.] [10 minutes] Initialled GLH

[Following pause, defendant present]

"THE COURT: Yes, Mr. Garber?

"MR. GARBER: Do you want to address the Court?

"DEFT. CURTIS: Judge, Your Honor, the only reason that I am going to let the record stay as it is, because I don't want to be hooked up in—I don't want the D. A., I know he will do it, to catch me up in some kind of lie.

"THE COURT: He won't catch you up in any lies if you don't tell any lies.

"DEFT. CURTIS: Well, I am not going to go through with it anyway.

"THE COURT: All right. You may be seated."

In view of all the foregoing, it is crystal clear and this Court so finds that defendant's allegations against his original counsel, Patricia Roberts Harris, are without the slightest foundation in fact,

are deliberate untruths, and are as completely frivolous as the Trial Court deemed them to be on March 30, 1971, when it first denied defendant's Motion under 28 U.S.C. § 2255.

Every day in our trial courts appointed counsel represent defendants in criminal cases. There are many hundreds of such representations each year. While these counsel now receive some remuneration, their services are essentially public service since they seldom, if ever, receive full compensation for their work. These counsel are a very dedicated group, for the most part, who represent the interests of the defendants conscientiously and well. As it is with all attorneys, whether their practice be civil or criminal, the reputation of these appointed attorneys is their most important asset and possession. If the reputation of appointed defense counsel is to be put in public question by the Courts in the cavalier fashion and on the unsworn, unsupported allegations of convicted felons as was done in this case, and in the Simpson case, then the members of our bar would be justified in declining appointments to defend.

Defendant's Motion under 18 U.S.C. § 2255 is again denied.